FIRST NATIONAL BANK OF CINCINNATI, ADMR., *v.* FISHMAN.

(No. 2299—Decided March 13, 1968.)

Probate Court of Hamilton County.

*Messrs. Marks & Weiner,* for The First National Bank of Cincinnati.
*Messrs. Goodman & Goodman,* for the next of kin of David Port, deceased.

DAVIES, J.   On January 5, 1966, in an action to determine heirship, brought by The First National Bank of Cincinnati, as administrator of the estate of David Port, a. k. a. David Portnoy, deceased, this court, in an opinion (7 Ohio Misc. 130), found that said decedent had died intestate, a resident of Hamilton County, Ohio, on April 28, 1958, and that on that date his next of kin were three brothers, two sisters, two nephews, two nieces, and two grand-nephews,

all of whom were domiciled in Soviet Russia. The court also found that the distributees of the Port estate, which was valued at approximately $35,000 and which had been accumulated by the guardian of the decedent from payments made by the United States government because of service connected disabilities incurred by the decedent in World War I, on January 5, 1966, would not have "the benefit or use or control of the money" due them as next of kin because of prevailing conditions in Russia, and directed that the money be delivered to The First National Bank of Cincinnati, as trustee, to be held for the Port distributees until such time as they could satisfy the Probate Court, as provided by law, of their right to receive the money under the following provisions of the Revised Code:

Section 2113.81. "Where it appears that a legatee or a distributee, or a beneficiary of a trust not residing within the United States or its territories will not have the benefit or use or control of the money or other property due him from an estate, because of circumstances prevailing at the place of residence of such legatee, distributee, or a beneficiary of a trust, the Probate Court may direct that such money be paid into the county treasury to be held in trust or the Probate Court may direct that such money or other property be delivered to a trustee which trustee shall have the same powers and duties provided in Section 2119.-03 of the Revised Code for such legatee, distributee, beneficiary of a trust or such persons who may thereafter be entitled thereto. Such money or other property held in trust by such county treasurer or trustee shall be paid out by order of the probate judge in accordance with Section 2113.82 of the Revised Code.

"The county treasury shall not be liable for interest on such money held in trust."

Section 2113.82. "When a person entitled to money or other property invested or turned into the county treasurer or to a trustee under Section 2113.81 of the Revised Code satisfies the Probate Court of his right to receive it, the court shall order the county treasurer or the trustee to pay it over to such person."

Parts of the court's opinion in deciding that the dis-

tributees would not have in Russia "the benefit or use or control of the money" due them from the Port estate read as follows:

"Russia is conducting a relentless *cold war* against the United States and has created on its boundaries an *iron curtain* guarded by soldier armed with machine guns isolating itself and its people from people and countries of the free world and withholding from the rest of the world by strict censorship and a completely controlled press information concerning its activities behind that iron curtain against other nations as well as against its own citizens.

"In the Soviet Union all rights are considered an express grant by the government. The Soviet legal system does not recognize natural or inalienable rights; Soviet laws confer mere privileges upon citizens, and these privileges can arbitrarily be curtailed or withdrawn at any time.

"Today the United States, in addition to the *cold war*, is enagaged in a *military war* in Vietnam which is being fought by American troops against a regime aided and supported by Russia and other Communistic governments. There is a constant flow of war supplies from Russia to North Vietnam and the Viet Cong. American planes are being shot down by Russian-made jet fighters and missiles launched from Russian-made missile sites.

"Russia is anxious to enlarge its gold supply, which can be done by the importation of American dollars from every available source.

"The transfer of property to a Russian legatee, distributee, or beneficiary from an Ohio decedent's estate must be effected through the Russian National Bank of Foreign Trade in Moscow in which bank United States dollars are converted into Russian rubles at an arbitrary exchange rate fixed by that governmental controlled bank and because of Russia's secret policies behind the *iron curtain* it is impossible for the court to ascertain from the evidence, which was in conflict, how much benefit or use or control Russian distributees will have of the Port estate's property or money (American dollars) paid to them in substituted Russian rubles.

"The Secretary of the Treasury, under federal law,

has determined banking facilities in general or local conditions in the Union of Soviet Socialist Republics are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value. The court is particularly impressed by this regulation because all of the money and property in David Port's estate came from the United States Veterans' Bureau. Furthermore, the court recognizes the fact that an agency of the United States government is in a better position than the court to determine if payees in Russia will actually receive checks or warrants drawn against funds of the United States. We are unable to draw a practical distinction between a 'payee' in Russia actually receiving a check or warrant drawn against funds of the United States and a 'distributee' in Russia having the 'benefit or use or control' of money or other property due him from an estate.

"The court is also impressed by the position, supported by the evidence, which has been taken by the First National Bank, now administrator of (and formerly, for twenty-three years before his death, guardian of) the estate of David Port, deceased, that none of the assets of the decedent's estate should be transferred at the present time to Russian distributees because 'under the currency exchange rates presently existing in Russia, any heirs residing in Russia would get, at the very most, only a minimal fraction of the value of the residue of this estate.' The First National Bank, the testimony shows, has had extensive experience in matters relating to foreign exchange in other countries including Russia and other 'iron curtain' countries.

"There is a strong probability that the Russian government will confiscate through the device of converting valuable American dollars at an arbitrary exchange rate into less valuable Russian rubles which may or may not be distributed to the Russian distributees who are entitled to receive the money or other property from David Port's

estate, with the result that the Russian government, and not the distributees, will have the benefit or use or control of the money or other property and use it in *cold* and *military* wars against the United States.

The court also found that the Secretary of the Treasury of the United States had determined that "(a) * * * postal, transportation, or banking facilities in general or local conditions in Albania, Bulgaria, Communist-controlled China, Czechoslovakia, Estonia, Hungary, Latvia, Lithuania, Rumania, the Union of Soviet Socialist Republics, the Russian Zone of Occupation of Germany, and the Russian Sector of Occupation of Berlin, Germany, are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value," and that "(d) power of attorney for the receipt or collection of checks or warrants of the proceeds of checks or warrants included within the determination of the Secretary of the Treasury set forth in paragraph (a) of this section will not be recognized."

The matter is now before the court upon the following application of the attorneys of record of the next of kin of David Port, deceased, "For Distribution of Funds" to said next of kin:

"Come now Goodman & Goodman, attorneys for the heirs hereinafter named, and make this application on their behalf, to wit:

"(1)   Shura Yakovlevna Portnaya (daughter of Yacob, or Yankel, Portnoy, or Portnaya, the predeceased brother of David Port), adult, niece, No. 55 Libknecht Street, City of Zhitomir, Russia   1/7

"(2)   Elka Moshkovna (Moiseevna) Fishman, adult, sister, No. 19 Malo-Vilskaya Street, City of Zhitomir, Russia   1/7

"(3) Anatoly Efimovich Druz, also known as Chaimovich (son of Reizl, also known as Reizia Portnoy Druz, predeceased sister of David Port), adult, newphew, No. 37 Warsaw Road, Apartment 1, Moscow, Russia   1/28

"(4) Ziama, also known as Zalman Chaimovich Druz (son of Reizl, also known as Reizia Portnoy Druz, predeceased sister of David Port), adult, nephew, No. 17a Malaya Botanicheskaya Street, Apartment 38, Moscow, Russia 1/28

"(5) Maria Efimovna Druz (daughter of Reizl, also known as Reizia Portnoy Druz, predeceased sister of David Port), adult, niece, No. 17a Malaya Botanicheskaya Street, Apartment 38, Moscow, Russia 1/28

"(6) Mikhail Ilyich Druz (son of Ilya Druz, the son of Reizl, also known as Reizia Portnoy Druz, sister of David Port, both Ilya and Reizl having predeceased David Port), adult, grand-nephew, No. 7 First Khoroshevskaya Street, Apartment 43, Moscow, Russia 1/56

"(7) Efim Ilyich Druz (son of Ilya Druz, the son of Reizl, also known as Reizia Portnoy Druz, sister of David Port, both Ilya and Reizl having predeceased David Port), adult, grand-nephew, City of Sverdlovsk, Russia 1/56

"(8) Leib Moshkovich Portnoy, also known as Lev Maiseevich Portnoy, adult, brother, No. 115 Sovietskaya Street, Town of Slododskoy, Kirovskaya Province, Russia 1/7

"(9) Mordko Moshkovich Portnoy, adult, brother, Apartment 51, No. 3 Noginskaya Street, Town of Elektrostal, Moscow Province, Russia 1/7

"(10) Zema Moshkovich Portnoy, adult, brother, The Pervomaiskaya SOS, Krasnodarsky Kraj, Russia 1/7

"(11) Feiga Moskovna Gil, also known as Faina Mikhailovna, adult, sister, Apartment 51, No. 3 Noginskaya Street, Town of Elektrostal, Moscow Province, Russia 1/7

"Your applicants represent that as of the date of this application conditions in the country where said heirs reside are such that the receipt of funds by way of inheritance from the estate herein would give and permit each of them the full use of such funds for their needs and purposes."

Since World War I, American courts often have been asked to determine if under state laws similar to Sections 2113.81 and 2113.82, Revised Code, distributees of American estates not residing in the United States or its territor-

ies will have the benefit or use or control of the money or other property due them from American estates because of conditions or circumstances prevailing at the places of residence of such distributees, or making the right of aliens to inherit contingent upon reciprocal rights established by treaties. Although the United States and Russia have been negotiating, a Soviet-American Treaty which, among other things, deals with the reciprocal rights of nationals of the two countries to receive property as distributees from estates of the two countries, this treaty has not yet been ratified by the two nations.

In an important case, *Clark* v. *Allen*, 331 U. S. 503, decided on June 9, 1947, the United States Supreme Court considered a case in which a resident of California devised her estate, real and personal, to a resident of East Germany. The existing California law provided that "the rights of aliens not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of the citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens and upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign countries. If such reciprocal rights are not found to exist and if no heirs other than such aliens are found eligible to take such property, the property shall be disposed of as escheated property." The court held that while there was a 1923 treaty with Germany which assured to German heirs of any person holding realty in the United States the right to inherit the same, the treaty did not cover personalty located in this country which an American citizen undertakes to leave to (East) German nationals.

It was argued on behalf of the distributees (page 516) in that case that even though the provision of the treaty was inapplicable, the personalty might not be disposed of pursuant to the California statute because that statute *was unconstitutional*. That argument was based on the fact that under the statute the right of nonresident aliens to take by succession or testamentary disposition is dependent upon the existence of reciprocal right on the part of citizens of the United States to take personalty on the same terms and conditions as residents and citizens of other nations; that by this method California sought to promote the right of American citizens to inherit abroad by offering to aliens reciprocal rights of inheritance in California; and that such an offer of reciprocal arrangements is a matter for settlement by the federal government on a nation-wide basis.

The court held that rights of succession to property are determined by local law, which rights may be affected by an overriding federal policy, as where a treaty makes different or conflicting arrangements, when the state policy must give way. "But here" (page 517) "there is no treaty governing the rights of succession to the personal property. Nor has California entered the forbidden domain of negotiating with a foreign country * * * or making a compact with it contrary to the prohibition of Article I, Section 10 of the Constitution."

The court finally held that "*Section 259 of the California Probate Code as it existed in 1942, which made the right of nonresident aliens to acquire personal property dependent upon the reciprocal rights of American citizens to do so in the countries of which such aliens are inhabitants or citizens, is not unconstitutional as an invasion by the state of the field of foreign affairs reserved to the Federal Government.*" (Emphasis added.)

This court's opinion, rendered on January 5, 1966, finding that the distributees of the estate of David Port, deceased, would not at that time "have the benefit or use or control of the money or other property" due them because of circumstances then prevailing in Russia, where they resided, was based upon the provisions of Sections 2113.81

and 2113.82, Revised Code, the finding of facts set forth in the opinion, and the conclusion, as determined by the Supreme Court in Clark v. Allen, supra, that a state law giving a state court authority to determine the right of nonresident aliens to acquire property under the state law is not "an invasion by the state of the field of foreign affairs reserved to the Federal Government."

*Although we firmly believe that the facts relating to the "cold war" and other matters outlined in this court's opinion rendered in the Port case on January 5, 1966, are the same now as then, this court, by reason of a recent case, decided by the Supreme Court of the United States on January 15, 1968, is now without authority to decide that distributees of the estate of David Port, deceased, who reside in Russia, "will not (now) have the benefit or use or control of the money or other property" due them from said estate, because of circumstances prevailing in Russia.*

In that case, Zschernig v. Miller, 389 U. S. 429, 19 L. Ed. 2d 683, 88 S. Ct.    , the facts disclose that the sole heirs of a resident of Oregon, who died there intestate, were residents of East Germany.  These relatives, as plaintiffs, brought proceedings in an Oregon Probate Court, for a determination of heirship in their favor. The state of Oregon, through its State Land Board, requested that the property be escheated to the state, pursuant to an Oregon statute so providing unless three requirements were satisfied: (1) the existence of a reciprocal right of American citizens to inherit in the alien's country upon the same terms as citizens of that country, (2) the right of United States citizens to receive payment within the United States from the estates of decedents dying in the foreign country, and (3) proof that the alien heirs of the American decedent would receive the benefit, use, and control of their inheritance without confiscation.  The Probate Court found that the evidence did not establish the existence of the requisite reciprocal rights, that the statute was valid and controlling, and that the proceeds of the estate escheated to the state of Oregon.  On appeal, the Oregon Supreme Court held that the plaintiff could take the Oregon realty involved in the

present case by reason of Article IV of the 1923 treaty with Germany, but that by reason of the same article, as construed in *Clark* v. *Allen*, 331 U. S. 503, 91 L. Ed. 1633, 67 S. Ct. 1431, 170 A. L. R. 953, they could not take the personalty. (243 Ore. 567, 412 P. 2d 781, reh. den. 243 Ore. 591, 415 P. 2d 15.)

On appeal, the Supreme Court of the United States reversed. Without re-examination of *Clark* v. *Allen, supra,* it was held in an opinion by Douglas, J., expressing the view of six members of the court, that, as applied, the Oregon statute was invalid as an intrusion by the state into the field of foreign affairs. Stewart, J., with the concurrence of Brennan, J., joined the opinion of the court in a separate opinion. Harlan, J., concurred in the result, upon the sole ground that the application of the Oregon statute in the present case conflicted with the 1923 treaty with Germany. White, J., dissented, on the ground that the Oregon statute was no impermissible interference with foreign affairs. Marshall, J., did not participate.

In its majority opinion the court held that the Oregon statute is invalid as an intrusion by the state into the field of foreign affairs entrusted by the Constitution to the President of the United States and the Congress, where the state courts, in construing the statute, made inquiries concerning the actual administration of foreign law and into the credibility of foreign diplomatic statements, and sought to ascertain whether rights protected by foreign law are the same rights that citizens of the state enjoy, and where the statute as construed seems to make unavoidable judicial criticism of nations established on a more authoritarian basis than the United States. The court also held that foreign affairs and international developments are matters which the United States Constitution entrusts solely to the federal government, that foreign policy attitudes, the freezing or thawing of the cold war, and the like, are matters for the federal government, not for local probate courts determining the right of a nonresident alien to inherit property in a state, that regulations, traditionally enacted by the states, as to the descent and distribution of

estates, must give way if they impair the effective exercise of the nation's foreign policy, that state laws as to the descent and distribution of estates, where in conflict with a treaty, must bow to the superior federal policy, and that the Oregon law does, indeed, illustrate the dangers which are involved if each state, speaking through its probate courts, is permitted to establish its own foreign policy.

In a separate opinion, Mr. Justice Stewart, with whom Mr. Justice Brennan joins, concurring, stated, in part, that "in my view, each of the three provisions of the Oregon law suffers from the same fatal infirmity. All three launch the state upon a prohibited voyage into a domain of exclusively federal competence. Any realistic attempt to apply any of the three criteria would necessarily involve the Oregon courts in an evaluation, either expressed or implied, of the administration of foreign law, the credibility of foreign diplomatic statements, and the policies of foreign governments. Of course state courts must routinely construe foreign law in the resolution of controversies properly before them, but here the courts of Oregon are thrust into these inquiries only because the Oregon Legislature has framed its inheritance laws to the prejudice of nations whose policies it disapproves and thus has trespassed upon an area where the Constitution contemplates that only the National Government shall operate. 'For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.' *Chinese Exclusion Case*, 130 U. S. 581, 606, 32 L. Ed. 1068, 1075, 9 S. Ct. 623. 'Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.' *Hines* v. *Davidowitz*, 312 U. S. 52, 63, 85 L. Ed. 581, 585, 61 S. Ct. 399."

Because of the Supreme Court's decision in *Zschernig* v. *Miller, supra*, that a state probate court is without authority under state law to determine that a distributee not residing within the United States or its territories "will

not have the benefit or use or control of the money or other property due him from an estate, because of circumstances prevailing at the place of residence of such * * * distributee * * *," as provided in Section 2113.81, Revised Code, this court must grant the application of the attorneys of record of the next of kin of David Port, deceased, "for distribution of funds" to said next of kin, and hereby orders The First National Bank of Cincinnati, as trustee, to pay over to such distributees the money or other property it is holding for their benefit, in accordance with the provisions of Section 2113.82, Revised Code, and the Ohio laws of descent and distribution.